AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT
6/16/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CD___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
6/16/22
CENTRAL DISTRICT OF CALIFORNIA
BY: ___eb___ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DIJON GIAVONNI LANDRUM,<br><br>Defendant. | Case No.  2:22-mj-02365-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 8, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Interference with Commerce by Robbery |
| 18 U.S.C. § 924(c) | Brandishing and Use of a Firearm in Furtherance of a Crime of Violence |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

  ☒ Continued on the attached sheet.

/s/ Stephen May
_____
Complainant's signature

Stephen May, Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    6/16/22                                    _____
                                                    Judge's signature

City and state:  Los Angeles, California            Hon. Margo A. Rocconi, U.S. Magistrate Judge
                                                    Printed name and title

AUSA: Jeremiah Levine

## AFFIDAVIT

I, Stephen J. May, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant for DIJON GIAVONNI LANDRUM ("LANDRUM") for violation of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery) and 924(c) (Brandishing and Use of a Firearm in Furtherance of a Crime of Violence). LANDRUM is currently in custody at the Los Angeles County Sheriff's Department Jail.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF AFFIANT

3. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for the past 23 years. From September 1999 through December 2003, I primarily worked as a Bank Robbery Investigator in the San Francisco Division of the FBI. From December 2003 to the present, I have worked as a Bank Robbery Investigator in the Los Angeles

1

Division of the FBI.  And since May 2005, I have also been the Bank Robbery Coordinator in the Los Angeles Division of the FBI.

4.   As a Bank Robbery Investigator and Bank Robbery Coordinator, I investigate bank robbery cases assigned to me and review, analyze, and disseminate investigative data (including bank surveillance photographs) on nearly all bank robberies that occur in the Central District of California.  Since May 2005, there have been more than 3,600 bank robberies in the Central District of California.

5.   Since October 2013, I have also been the lead FBI Agent for the San Gabriel Valley Violent Crime Task Force, which works in conjunction with Task Force Officers from the Los Angeles County Sheriff's Department to investigate commercial and retail robberies.

6.   On February 27th and 28th of 2014, I received basic training (Cellular Survey Analysis and Geo-location) from the FBI Cellular Analysis and Survey Team, which included utilizing cellular tower logs to identify a subject phone or phones of different crimes, even when it was not clear whether a cell phone was in use during the commission of the crime.  I have also analyzed tower dump data sets and historical cell site data sets for my own FBI cases and other local police departments' investigations on a number of occasions.

7.   On September 8, 2020, I completed the ZetX E-learning eight-hour (self-paced) training course – "Forensic Analysis of Cellular Networks."  The course provided a detailed instruction on cellular technologies operating in the United States.  The

history of cellular technologies, the different technologies used in cellular networks, and mapping considerations associated with the networks were thoroughly covered.  Additionally, there was an introduction to drive-test techniques (network survey), equipment overview, and how to map and analyze drive test data.  The course concluded with instruction about how to present forensic call detail mapping evidence in court.

8.      On November 4 and continuing through November 6, 2020, I virtually attended and completed the ZetX WEXA training conference.  The WEXA Conference brought together Historical Cell Site Location Information Subject Matter Experts from across the nation to present criminal investigations and shared investigative approaches.  In addition, the WEXA conference covered Long Term Evolution technology, Radio Frequency exposure, real-time location data, cellular technology updates, and drive-test surveys.

9.      In connection with the bank robbery and commercial/retail robbery investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data, and reviewing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, including FBI Special Agents and local law enforcement detectives who were experienced with commercial robbery investigations, I am familiar with the methods used by

individuals to commit commercial robberies as well as effective investigative methods used to solve them.

### III. SUMMARY OF PROBABLE CAUSE

10. On June 8, 2022, a 7-Eleven store in Pico Rivera, California was robbed by an armed lone Hispanic male. After taking approximately $100 from the store, the robber left and led the Los Angeles County Sheriff's Department ("LASD") on a pursuit that ultimately led to the apprehension and arrest of LANDRUM. At the scene, LANDRUM was in possession of an extended, loaded magazine and U.S. Currency. Also, inside a bag believed to be used during the robbery, law enforcement recovered a loaded semiautomatic handgun.

### IV. STATEMENT OF PROBABLE CAUSE

**A. On June 8, 2022, a 7-Eleven in Pico Rivera, California is Robbed**

11. On June 8, 2022, at approximately 9:38 a.m., an armed, lone Hispanic robbed the 7-Eleven located at 8650 Beverly Boulevard, Pico Rivera, California. LASD responded to the robbery. Based on my review of the incident report, I learned the following:

   a. Upon arrival, LASD interviewed store employee/victim J.D. J.D. stated that the robber walked into the store and headed to the store counter. Once at the counter, the robber opened his backpack and pointed to a gun that was inside the backpack at J.D. J.D. stated that while the robber pointed at the gun at J.D., the robber said something to the effect of, "Open your register and give me the money." J.D.

stated that J.D. was in fear for his life. J.D. opened the cash register and gave the robber approximately $100 in U.S. currency. J.D. stated that he also gave the robber a bundle of one-dollar bills, which contained a tracking device. J.D. stated the robber put the money in the backpack, walked out of the store, and went out of view.

        b. J.D. stated the robber wore a black surgical mask, white t-shirt, dark pants, and carried a dark color backpack. Also, the robber was a Hispanic male.

        c. LASD reviewed the surveillance video and observed a Hispanic male, wearing a red beanie, a black surgical mask, white shirt, and dark pants enter the store and proceed to the store counter. Once at the counter, the robber opened his backpack and pointed to the contents inside the backpack. J.D. opened the cash register and gave the robber an unknown amount of U.S. currency. The robber exited the store and out of view.

        d. The loss to 7-Eleven was approximately $106.70 in United States currency.

    **B. Suspect Vehicle Identified - Pursuit Ensues**

12. LASD Detectives Kurinij and S. Fernandez met with helicopter unit Air 8 and learned the following:

        a. As mentioned by the store employee/victim, J.D., an electronic tracking device was taken by the robber. Based on the Global Positioning System ("GPS"), the LASD "Air 8" responded to the area of Beverly Boulevard and Rosemead Boulevard to check the area in response to the updated GPS location data provided by LASD Pico Rivera Station via radio.

Air 8 received an update that the tracking device was moving southbound on Paramount Boulevard from Beverly Road. Air 8 observed what they believed to be an unidentified Chrysler sedan and a black pickup truck (the suspect vehicle) traveling south. The Chrysler sedan continued southbound on Paramount Boulevard and the suspect vehicle made an eastbound turn at the rear of the shopping center located at the corner of Paramount Boulevard and Whitter Boulevard. The next GPS update was consistent with the driving pattern of the suspect vehicle observed by Air 8.

      b.  Air 8 continued to observe and follow the suspect vehicle. At one point, the suspect vehicle made an eastbound turn onto Mines Avenue. Air 8 guided an LASD marked unit to the suspect vehicle's location. Patrol units attempted a traffic stop of the suspect vehicle when the vehicle turned northbound onto Cord Avenue from Mines Avenue. The suspect vehicle stopped for several seconds, then fled northbound on Cord Avenue, eastbound on Aldrich Street, and southbound into the alley east of Cord Avenue. The suspect exited the vehicle and fled on foot with a backpack. Air 8 directed deputies to the suspect's location on a riverbed where the suspect was eventually taken into custody.

      **C.  LANDRUM exited the Suspect Vehicle and Ran**

    13.  LASD deputies Meza, Gonzalez, and Sy were part of the pursuit. Both deputies were in a patrol car together and encountered the suspect vehicle near the East/West alley from Cord Avenue. When they arrived, Deputy Gonzalez observed the suspect exit the vehicle. The suspect was a Hispanic male,

6

carrying a black backpack. The suspect ran east through the alley toward Rimbank Avenue. Deputies Gonzalez and Sy followed the suspect on foot. They continued to follow the suspect east through the riverbed. At no time did Deputy Gonzalez lose observation of the suspect. The suspect ran down toward the ravine of the riverbed, toward a jetty of rocks. At this point, the suspect took off the backpack and threw it to the ground. Deputy Gonzalez observed another deputy, Torres, go down and recover the backpack that the suspect had just discarded from his person. Deputies Gonzalez and Sy continued to follow the suspect.

14. The suspect continued to run, and Deputy Gonzalez gave verbal commands to the suspect to stop running. As the suspect made his way toward a fence line, Deputy Gonzalez grasped both of the suspects hands and proceeded to handcuff the suspect.

**D. In-field Lineup Administered by LASD**

15. The victim was taken to the location where LANDRUM was being detained. After being read an admonishment, the victim could not identify the suspect due to the suspect wearing a surgical mask.

16. The victim did identify the backpack, the gun, the money, and the tracking device as items carried by the suspect during the robbery.

**E. Handgun, Money, and Clothing Items Recovered**

17. Detectives Kurinij and Fernandez arrived at the location where the suspect vehicle was located. In plain sight on the front passenger side floorboard of the vehicle were a

7

black Covid-style mask, a red beanie, a white t-shirt, and a pair of dark blue tennis shoes with white soles. Based on Detective Fernandez's viewing of the 7-Eleven video of the robbery, that appears to be the same clothing worn by the robber.

    a. Based on my training and experience, it is typical for robbers to change clothes shortly after a robbery to hide their identities.

18. Law enforcement reviewed the contents of the bag that LANDRUM had thrown while fleeing, and that Deputy Torres had recovered. Inside the bag was a black semi-automatic handgun. It was later determined that the black semiautomatic handgun did not have a serial number and was believed to be a "ghost gun." The gun was chambered with a round of ammunition and had a loaded magazine in the magazine well.

19. At the time of LANDRUM's arrest, Deputy Sy discovered that LANDRUM had an extended magazine (later determined to be capable of holding 30 rounds of ammunition and that had 24 rounds in the magazine) and a small amount of cash in his right front pants pocket, which included the tracking device.

    **F.   Clothing Worn at the Time of LANDRUM's Arrest**

20. Detective Fernandez reviewed video from a Chevron gas station located at 3900 Rosemead Boulevard. Based on his viewing, Detective Fernandez observed the following:

    a. Following the robbery, at approximately 9:45 a.m., the suspect entered the Chevron station in the suspect vehicle and parked. The suspect began to pump gas. The suspect

entered the gas station and appeared to talk to the clerk. The suspect returned to the pickup truck and removed the gas pump as the video ended.

      b.    The suspect appeared to be wearing the clothing in which he was eventually arrested:- a light baseball cap with a dark bill, a camouflage t-shirt, gray pants, and light-colored tennis shoes. The gray pants appear to be the same pants that were worn during the robbery.

      G.    **LASD Attempted to Interview LANDRUM**

    21.    Detective Kurinij and Fernandez attempted to interview LANDRUM after his arrest. LANDRUM invoked his right to counsel and the interview was terminated without any statements being made.

      H.    **LANDRUM's Criminal History**

    22.    I reviewed LANDRUM's criminal history and learned the following: on August 29, 2021, LANDRUM was sentenced to two years' incarceration for violation of California Penal Code 212.5(C), second degree robbery; and 16 months incarceration for violation of California Penal Code 10851(A), taking vehicle without owner's consent/vehicle theft.

      I.    **LANDRUM is on Active Parole**

    23.    Detective Kurinij spoke directly to LANDRUM's parole agent and the parole agent confirmed that LANDRUM was on active parole for robbery. Based on the current above-mentioned robbery, the parole agent was in the process of placing a hold on LANDRUM. LANDRUMS's discharge date was set for August 29, 2023.

**J.   7-Eleven Sells Goods in and Affecting Interstate Commerce**

24.  7-Eleven stores are businesses that engage in interstate commerce.  I reviewed the company's website and can attest:

    a.  "What started in an icehouse in Dallas, Texas, back in 1927 has evolved into the world's largest retailer.  Today, 7-Eleven operates, franchises and licenses close to 10,000 locations in the U.S. and Canada and more than 71,100 stores in 17 countries around the world."

///

## V.  CONCLUSION

25.  For all the reasons described above, there is probable cause to believe that LANDRUM violated 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery) and 924(c) (Brandishing and Use of a Firearm in Furtherance of a Crime of Violence) as described above.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  16th day of
June, 2022.

HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE